EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| In re: | Querella |
|---|---|
| Jorge Ortiz Brunet | 2000 TSPR 170 |

Número del Caso: CP-1998-0010

Fecha: 22/noviembre/2000

Oficina del Procurador General:

Lcda. Ivonne Casanova Pelosi
Procuradora General Auxiliar

Abogados de la Parte Recurrida:

Lcdo. Ramón A. Guzmán Rivera

Materia: Conducta Profesional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

**In re:**

LCDO. JORGE ORTIZ BRUNET                    CP-1998-10

Opinión del Tribunal emitida por el Juez Asociado SEÑOR REBOLLO LOPEZ

San Juan, Puerto Rico, a 22 de noviembre de 2000

**El 31 de enero de 1996 un hijo del Sr. Ferdinand Medina Molina perdió la vida como consecuencia de un accidente automovilístico ocurrido en Arecibo, Puerto Rico. Según surge de autos, un camión de la Autoridad de Energía Eléctrica arrastraba un carruaje en el que se había colocado un poste de madera de los usados para las instalaciones de líneas eléctricas. El carruaje donde habían colocado el poste se desprendió del camión e impactó el automóvil conducido por el joven Medina, causándole la muerte.**

El mismo día del accidente, luego de enterarse de la ocurrencia del mismo, y en horas de la tarde, el señor Mario Maldonado visitó la

casa de Medina Molina. Maldonado se desempeñaba como locutor y periodista de la estación de radio WCNN de Arecibo. Maldonado, además, era corresponsal de la cadena radial Noti Uno y reportero de Prensa Asociada; su visita al hogar de los Medina, alegadamente, fue motivada por interés periodístico y, según sus palabras, por curiosidad. Maldonado conocía al Sr. Medina Molina por medio de encuentros en actividades deportivas de las cuales éste era aficionado. Cuando Maldonado llegó a la casa de Medina Molina encontró allí a varios amigos y parientes de Medina reunidos. Comentaban éstos que el accidente se debió a la negligencia de la Autoridad de Energía Eléctrica, ya que sus empleados alegadamente no habían asegurado, con el debido cuidado, el carretón en que estaba el poste al camión que lo arrastraba. Comentaban estas personas, además, sobre la conveniencia de que el Sr. Medina buscara asesoramiento legal. Fue entonces que Maldonado recomendó al licenciado Jorge Ortiz Brunet, señalando la vasta experiencia de éste en casos de daños y perjuicios. Le explicó al Sr. Medina que lo había conocido en una actividad del Aero Club en Arecibo. Recordó, entonces, que tenía en su cartera una tarjeta de presentación del licenciado Ortiz Brunet y se la entregó al Sr. Medina Molina. Esa misma tarde, el Sr. Maldonado, llamó al referido abogado por teléfono. Según Maldonado, conocía al licenciado Ortiz Brunet desde hacía años y conservaba su tarjeta de presentación profesional desde entonces.

El día próximo al del accidente, 1 de febrero de 1996, arribó el licenciado Ortiz Brunet en un helicóptero al parque del sector La Planta de Arecibo. Allí se habían reunido familiares y amigos de Ferdinand Medina Molina. Se esperaba, en dicho lugar, la entrega del cadáver del joven fallecido. El Lcdo. Ortiz Brunet, quien alega que no tenía conocimiento del hecho de que estaban en espera del cadáver, se acercó al padre de la víctima. Se identificó y le entregó su tarjeta. Se retiró inmediatamente y se trasladó a una finca cercana donde su familia tenía un aserradero. Al día siguiente partió para Cali, Colombia. Era abogado de algunos de los demandantes en el caso de un accidente aéreo que ocurrió en esa Ciudad y en el cual fallecieron todos los pasajeros y la tripulación. El propósito de dicho viaje era investigar el accidente. Regresó a Puerto Rico el 9 de febrero, visitando

a Ferdinand Medina en varias ocasiones durante ese mes, hasta que, el día 14 de febrero, la familia Medina le firmó un contrato de servicios profesionales.

El 18 de marzo de 1998, la Oficina del Procurador General de Puerto Rico, luego de la queja y la investigación de rigor[1], sometió un informe ante nos en referencia a la conducta profesional de los abogados Jorge Ortiz Brunet y José G. Izquierdo Stella. El informe sometido se refería a la

---

[1] **Según surge de la querella, el 24 de noviembre de 1997, compareció ante el Procurador General el Presidente del Colegio de Abogados de Puerto Rico señalando que su institución había recogido a la mano un sobre, sin remitente, conteniendo copia de parte de una deposición tomada al señor Ferdinand Molina el 1 de mayo de 1997 dentro del caso civil ante la Corte de Distrito Federal Núm. 96-1327 (JAF), <u>Jason Medina</u> v. <u>Puerto Rico Electric Power Authority y otros</u>. En dicha deposición, y a preguntas de la representación legal de uno de los demandados, el señor Medina narra la alegada forma y manera en que contrató los servicios profesionales de su representante legal, el Lcdo. Jorge Ortiz Brunet. De dicha deposición surge que el 1 de febrero de 1996, el declarante se encontraba en el parque de pelota del Barrio La Planta de Arecibo esperando, junto a otros miembros de la comunidad, que le hicieran entrega del cadáver de su hijo que había fallecido el día anterior. Según el declarante, en dicha ocasión aterrizó en el parque de pelota un helicóptero del cual bajó el Lcdo. Jorge Ortiz Brunet. <u>Declaró, además, que el Sr. Mario Maldonado le había indicado que dicho abogado llegaría ese día en helicóptero a visitarlo</u>. <u>Atestó que no sabía quién había contactado al abogado ya que nunca le había dicho al señor Maldonado que solicitara sus servicios</u>.**

**En cambio, en declaración jurada ante el notario Jorge L. Pérez Abreu, el 9 de febrero de 1998, el Sr. Ferdinand Medina declaró textualmente que:**

> **"A pesar de la toma deposición que se tomó el día 1 de mayo de 1997 donde manifesté que no recordaba el asunto la realidad es que el Lcdo. Jorge Ortiz Brunet visitó mi hogar para orientarme legalmente con mi autorización.**
>
> **Que el día que me llamaron para la toma de la deposición me encontraba molesto y nervioso y han ocurrido tantas cosas dolorosas en mi vida y con la presión ejercida durante la toma de deposición verdaderamente no recordaba bien el incidente de cómo contraté los servicios del Lcdo. Jorge Ortiz Brunet. Nadie llega a mi casa sin mi autorización."**

conducta profesional de dichos abogados en relación al antes mencionado accidente automovilístico, ocurrido el 31 de enero de 1996. Visto el informe sometido por la oficina del Procurador General, emitimos Resolución el 25 de agosto de 1998, ordenando la formulación de la correspondiente querella. El 5 de octubre de 1998, la Procuradora General Auxiliar radicó una querella en la que incluyó tanto al licenciado Ortiz Brunet como al licenciado Izquierdo Stella. A cada uno de los abogados se les imputó violación a los Cánones 34 y 38 del Código de Etica Profesional. Se alegó que ambos habían actuado de forma impropia para conseguir la representación profesional del Sr. Medina Molina y de su familia en la potencial demanda por la reclamación de los daños y perjuicios sufridos por éstos con motivo de la muerte del joven Medina.[2]

El 20 de noviembre de 1998 emitimos resolución ordenando ventilar, <u>de forma separada</u>, las querellas contra los licenciados Ortiz Brunet e Izquierdo Stella. Posteriormente, el 26 de octubre de 1999, designamos un Comisionado Especial para entender en la querella contra el licenciado Ortiz Brunet. Celebrada la vista, el 13 de marzo de 2000, el Comisionado Especial emitió su informe con su relación del caso y determinaciones de hechos.

Según surge del informe del Comisionado Especial, no se puede inferir que el Sr. Maldonado, al sugerirle al Sr. Medina Molina que contratara los servicios profesionales del licenciado Ortiz Brunet, estuviese actuando

---

**[2] Los cargos imputados en la querella se expusieron de la siguiente forma:**

> **"Cargo I: Los licenciados Ortiz Brunet e Izquierdo Stella violentaron los principios establecidos por el Canon 34 de Etica Profesional el cual, entre otras cosas, obliga a todo abogado a abstenerse a ofrecer ya sea directamente o a través de intermediarios sin ser requerido a ofrecer su consejo o asesoramiento legal a clientes potenciales para iniciar reclamaciones judiciales.**

> **Cargo II: Los licenciados Ortiz Brunet e Izquierdo Stella violentaron los principios establecidos por el Canon 38 de Etica profesional el cual, entre otras cosas, obligan a todo abogado a preservar el honor y dignidad de la profesión legal y a evitar hasta la apariencia de conducta profesional impropia."**

como agente de éste. Concluye, además, el Comisionado Especial que la llamada realizada por el Sr. Maldonado al licenciado Ortiz Brunet fue motivada por la petición que supuestamente hiciera Medina Molina a esos efectos. Por otro lado, también concluyó el Comisionado que el día en que el licenciado Ortiz Brunet aterrizó en helicóptero en el parque de pelota, éste ignoraba que la presencia de aquellas personas en el parque estaba motivada por el hecho de que esperaban por la entrega del cadáver del joven Medina.

**Sometido el caso ante nuestra consideración, y contando con el informe del Comisionado Especial, y los alegatos del Procurador General y del abogado querellado, procedemos a resolver.**

I

Anteriormente hemos analizado la naturaleza de la función encomendada a un Comisionado Especial designado por este Foro para atender una querella incoada contra un abogado. Hemos determinado que corresponde al Comisionado Especial recibir prueba y evaluar y dirimir la evidencia conflictiva. In re: Morales Soto, 134 D.P.R. 1012 (1994). El Comisionado ocupa el papel del juzgador de instancia y, por lo tanto, está en mejor posición para aquilatar la prueba testifical. Es por esta razón que sus determinaciones al evaluar esa prueba merecen nuestra mayor deferencia. In re: Soto López, 135 D.P.R. 642 (1994).

Por tal razón, hemos reiterado que aunque este Tribunal no está obligado a aceptar el informe de un Comisionado Especial nombrado para atender una querella contra un abogado, pudiendo este tribunal adoptar, modificar o rechazar tal informe, no alteraremos las conclusiones de hecho de un Comisionado Especial salvo que se demuestre prejuicio, parcialidad o error manifiesto. In re: Soto López, ante.

En su informe, el Comisionado Especial describe el proceso llevado a cabo para la ventilación de la querella que nos ocupa. Apunta que "[l]uego de algunos incidentes procesales de menor importancia, la vista se celebró el 13 de marzo de 2000. En dicha fecha, las partes sometieron por estipulación declaraciones juradas; parte de una deposición que se le tomó al Sr. Ferdinand Medina Molina; documentos relacionados con salidas y aterrizajes

del avión y del helicóptero piloteado por el Lcdo. Ortiz Brunet; escrituras de fincas de la familia Ortiz en el área donde vive el Sr. Medina Molina; recortes de periódicos en los que se reportaban los éxitos profesionales del Lcdo. Jorge Ortiz Brunet, particularmente cuando se desempeñó como fiscal federal auxiliar. El Lcdo. Ortiz Brunet prestó declaración oral, la que ilustró en parte mostrando un "vídeo" de televisión, tomado desde su helicóptero, con el propósito de demostrar que una de las fincas de la familia queda bastante cerca de la residencia del Sr. Medina Molina y otra, aunque mas retirada, está ubicada en la misma área. Además, aclaró que "no tuvo la oportunidad de ver y oír declarar ni al locutor Mario Maldonado ni a Ferdinand Medina Molina." En todo lo respectivo a tales fuentes se refirió a sus declaraciones juradas y a la deposición de Medina Molina.

Es norma firmemente establecida que la regla de deferencia a las determinaciones de hecho del Comisionado Especial, igual que en el caso de los jueces de instancia y los oficiales examinadores, se aplica exclusivamente a testimonios orales vertidos en su presencia, ya que es éste quien observa la actitud de los testigos, su forma de declarar, sus gestos, y en general, su conducta al prestar declaración. Castro v. Meléndez, 82 D.P.R. 573 (1961).

**De manera que, la norma de deferencia respecto a las determinaciones de hecho del Comisionado Especial no aplica cuando la evidencia consiste de deposiciones, estipulaciones escritas u orales, o por hechos incontrovertidos por las alegaciones o la prueba. Cuando estamos ante prueba documental, este Tribunal está en igual posición que el Comisionado Especial para hacer sus propias determinaciones y no podemos renunciar a ello sin afectar la efectividad de nuestra función disciplinaria.**

Un examen cuidadoso del expediente de este caso revela que muchas de las determinaciones de hecho del Comisionado descansan en el otorgamiento de credibilidad a ciertas declaraciones de testigos que constan por escrito y que riñen con otras igualmente escritas, pero absolutamente contrarias en sus afirmaciones. Debemos señalar, en esta etapa, que en el descargo de nuestra función disciplinaria, no coincidimos completamente con algunas de dichas determinaciones. Ejemplo de esto es la afirmación de que el licenciado

Ortiz Brunet, al momento de aterrizar su helicóptero en el parque de pelota para encontrarse con el Sr. Medina, no sabía que estaban en espera del cadáver del hijo de éste. No coincidimos, en particular, con el criterio del Comisionado Especial a los efectos de que, durante la conversación telefónica que sostuvieron el Sr. Maldonado y el licenciado Brunet, y en vista de la contemporaneidad entre el momento de la llamada y la ocurrencia de los hechos dañosos, que el Sr. Maldonado no le haya informado al licenciado Ortiz de la posible presencia del Sr. Medina, al otro día, en el parque de pelota con el propósito de recibir el cadáver de su hijo.

II

Los Cánones de Etica Profesional establecen las pautas mínimas que deben guiar a los miembros de la clase togada en el desempeño de su delicada faena. In re: Filardi Guzmán, res. el 23 de enero de 1998, 144 D.P.R. ___ (1998). Huelga decir que lo ideal es que todos los abogados actúen a un nivel superior --y no al margen-- de los mismos.

**En el caso que nos ocupa, se le imputa al licenciado Ortiz Brunet la violación al Canon 34 de Etica Profesional. Según se dispone en dicho Canon:**

> "Actúa contrario a los altos postulados de la profesión el abogado que, con propósito de lucro y sin ser requerido para que ofrezca su consejo o asesoramiento legal, aliente o estimule, en alguna forma, a clientes potenciales para que inicien reclamaciones judiciales o de cualquier otra índole. Es también contrario a la sana práctica de la profesión el que un abogado, sin ser requerido, bien lo haga personalmente o a través de personas, investigue o rebusque defectos en títulos u otras posibles fuentes o causas de reclamaciones a los fines de beneficiarse en alguna forma mediante la prestación de sus servicios profesionales.
>
> Empaña la integridad y el prestigio de la profesión y es altamente reprobable el que un abogado, actuando directamente o a través de intermediarios o agentes, haga gestiones para proporcionarse casos o reclamaciones en qu[é] intervenir o para proporcionarlos a otros abogados. Incurre en igual falta el abogado que dé u ofrezca beneficios, favores o compensación de clase alguna a empleados públicos, ajustadores de seguros u otras terceras personas con el fin de ganarse su favor para el referimiento de asuntos que puedan dar base a reclamaciones o casos y, por ende, proporcionarle al abogado aumento en su clientela.
>
> Por tratarse de una conducta desdorosa, tanto con respecto a la profesión legal como con la justicia en general, todo abogado está obligado a informar a los organismos competentes sobre cualquier caso en que se incurra en dicha práctica impropia y reprensible inmediatamente después de tener conocimiento de ello." 4 L.P.R.A. Ap. IX, C. 34.

Tradicionalmente la profesión legal ha mirado con recelo el uso de la publicidad y la solicitación. Esta actitud parte de la creencia de que la virtud y la buena reputación son la mejor promoción. Desde 1908 la diversa reglamentación ética propuesta por la Asociación de Abogados Americanos (American Bar Association) ha delineado normas al respecto. L. Hill*, A Lawyer's Pecuniary Gain: The Enigma of Impermissible Solicitation*, 5 Geo. J. Legal Ethics 393, 394 (1991); L. Hill, *Solicitation by Lawyers: Piercing the First Ammendment Veil*, 42 Me. L. Rev. 369, 370 (1990); Nota: *Constitutional Regulation of "Targeted Direct Mail Solicitation"' By Attorneys after Shapero a Proposed Rule Of Conduct*, 34 Vill. L. Rev. 281 (1989); Nota: *Shapero v. Kentucky Bar Association and Targeted, DirectMail Solicitation by Lawyers: How can States Protect Their Residents from Overreaching and Deceptive Solicitation?*, 1989 (Núms. 12) Utah L. Rev. 521, 522 (1989); C. Wolfram, *Modern Legal Ethics*, pág. 776 (1986); N. Zomick*, Attorney Solicitation of Clients: Proposed Solutions*, 7 Hofstra L. Rev. 755, 757 (1979). Puerto Rico no es excepción.

Entendemos que el mejor anuncio del abogado es la reputación de idoneidad ganada en el ejercicio de su profesión.

En contraste, la solicitación personal por abogado está prohibida --Ohralik v. Ohio State Bar Assn., 436 U.S. 447, 465-466 (1978), supra,-- ya que la confrontación cara a cara:

> "[...]es significativamente mayor cuando un abogado, profesional entrenado en el arte de la persuasión, realiza --personalmente-- actos de solicitación a una persona no sofisticada, lesionada o angustiada. Tal individuo puede colocar su confianza en el abogado, independientemente de sus calificaciones o a la necesidad real de tener representación, simplemente como respuesta a la persuasión bajo circunstancias conducentes a un consentimiento no informado. Aunque se argumenta que la solicitación personal es valiosa porque permite informar a una víctima de alguna desgracia acerca de sus derechos legales, la misma condición de esa persona no sólo la hace más susceptible a ser influenciada, sino que, además, la consulta sea más intrusiva. Bajo estas condiciones adversas, las propuestas de un abogado no llamado (uninvited) para una consulta pueden angustiar al individuo simplemente por la intromisión e invasión a su intimidad, aunque no se materialice ningún daño. En estas circunstancias no es irrazonable que el Estado presuma que la solicitación personal por abogado, en unas

**ocasiones más que otras, será perjudicial a la persona solicitada." (Traducción nuestra.)[3]**

**En autos constan varias declaraciones juradas, entre ellas deposiciones, de los señores Maldonado y Medina. Resulta especialmente reveladora la deposición, tomada al Sr. Medina, que diera motivo a la radicación de la querella que nos ocupa. En ella el declarante, Sr. Medina, expone que mientras esperaban en el parque de pelota por la entrega del cadáver de su hijo al día siguiente del de la ocurrencia del accidente, aterrizó en el parque un helicóptero que transportaba al licenciado Ortiz Brunet. Declaró que el Sr. Maldonado le había indicado que dicho abogado llegaría ese día en helicóptero a visitarlo. Por otro lado, afirmó que nunca le dijo al Sr. Maldonado que llamara al licenciado Ortiz Brunet. Conforme esta declaración prestada por el Sr. Medina, cuando el licenciado Ortiz Brunet llegó al parque de pelota, se dirigió a él. Ante acercamiento tan directo, el declarante le informó al abogado que no se encontraba en disposición de hablar con nadie y que quería concentrarse solamente en todo lo referente a su hijo. Según declaró, el abogado volvió a visitarlo en varias ocasiones a su residencia para ofrecer sus servicios, hasta que aproximadamente en la quinta o sexta visita logró convencerlo de que lo contratara. Atestó que no se decidió inmediatamente a contratarlo ya que había otro abogado interesado en el caso.**

Esta declaración fue hecha por el Sr. Medina en una deposición dentro del caso civil ante la Corte de Distrito Federal y no en un proceso que tenía como propósito cuestionar la corrección de la conducta profesional del licenciado Ortiz Brunet. El declarante no articulaba queja alguna contra el licenciado Ortiz; sólo contestaba las preguntas del abogado de los demandados en dicho caso. Demás está decir que no albergaba deseo alguno de perjudicar al abogado que él mismo había decidido contratar.

---

[3] Como vemos, la situación expuesta fue considerada por el mencionado tribunal como suficiente para establecer una norma profiláctica tajante contra la solicitación personal. Además, el tribunal consideró importante que la solicitación personal, contrario a la escrita, en muchas ocasiones no es susceptible de ser verificada debido a que, usualmente, se lleva a cabo en privado, sin testigos o evidencia escrita de lo dicho por el abogado.

El 9 de febrero de 1998, el Sr. Medina Molina emitió otra declaración jurada, sometida por el licenciado Ortiz Brunet, en la que el declarante hace afirmaciones contrarias a las hechas en la antes mencionada deposición. En esta declaración jurada Medina Molina declara que le había indicado a Maldonado que le notificara al licenciado Ortiz Brunet que deseaba que lo visitara. Ello coincide con lo declarado por Maldonado en su primera declaración jurada y que luego fuera contradicho por él mismo a los efectos de que lo que realmente informó al licenciado Ortiz Brunet fue que el Sr. Medina había solicitado que lo llamara por teléfono.

El 25 de febrero de 1998, ante preguntas del Procurador General, el Sr. Medina reiteró las declaraciones hechas en su deposición, originaria de este proceso. Indicó Medina que, a pesar de que recibió en su hogar al licenciado Ortiz Brunet en varias ocasiones, lo hizo a insistencias de éste. Afirmó que, aunque lo contrató voluntariamente, se sintió presionado. Aclaró que la primera visita que le hiciera el abogado ocurrió cuando apenas le habían entregado el cadáver de su hijo y que la misma no fue a petición suya. Añadió que, como parte del proceso para convencerlo de que lo contratara, le mostró un sinnúmero de demandas que había presentado a nombre de otros clientes como evidencia de su experiencia profesional.

**En caso de otorgarle entera credibilidad a esta versión de los hechos estaríamos ante un caso claro y lamentable de solicitación personal por parte del licenciado Ortiz Brunet. De hecho, nos inclinamos a pensar que así ocurrió. Las afirmaciones hechas por el Sr. Medina en su deposición originaria de este proceso disciplinario están acompañadas de mayores y contundentes indicios de confiabilidad en comparación con las versiones que surgen del examen de las declaraciones juradas posteriores presentadas como prueba por el licenciado Ortiz Brunet. Las declaraciones hechas por el Sr. Medina en su deposición para el proceso judicial ante el tribunal federal no estaban afectadas por proceso disciplinario alguno, además de que el tema relativo al proceso de contratación del licenciado Ortiz Brunet y el Sr. Medina no era uno sobre el cual este último tuviera, evidentemente, que tomar**

Ello justifica una restricción mayor del Estado. Véase, además: In re; José

**precauciones al momento de abordarlo durante aquel proceso. Por otro lado, estamos ante una declaración más cercana, temporalmente, a los hechos en controversia, y luego, corroborada ante preguntas del Procurador General durante la tramitación de la querella que está ante nuestra atención. No encontramos en los hechos indicio alguno de que, en ese momento, el Sr. Medina tuviese algún motivo, o deseo, para mentir al respecto.**

De tales declaraciones del Sr. Medina surge que él no solicitó la visita del licenciado Ortiz Brunet, y mucho menos la visita de dicho abogado el mismo día y durante el momento en que estaría recibiendo el cadáver del hijo por el que tanto sufrió. Por otro lado, las continuas visitas del licenciado Ortiz Brunet y su despliegue de recursos de persuasión ante el Sr. Medina son prueba clara de que solicitaba a éste la tramitación de su causa de acción por medio de su gestión profesional. Por lo menos cuatro visitas del licenciado Ortiz Brunet al hogar del Sr. Medina acontecieron durante un plazo de catorce días, inmediatamente posterior a la muerte del hijo de este último, hasta que finalmente se obtuvo el vínculo contractual. Esta es, sin duda, una conducta altamente cuestionable y sospechosa en atención al momento emocional que estaba sufriendo el Sr. Medina.[4]

---

R. Franco Rivera y Juan Masini Soler, 134 D.P.R. 823 (1993).

[4] **Posteriormente, en la tramitación de la querella, el licenciado Ortiz Brunet presentó en evidencia una declaración jurada tomada a Maldonado con miras a defenderse de los cargos imputados. En dicha declaración jurada, Maldonado afirmó que a raíz del accidente procedió a entrevistar al señor Medina en su hogar y que durante su visita salió a relucir la necesidad de representación legal. Alegadamente le informó al Sr. Medina que él conocía al licenciado Ortiz Brunet. En cambio, el Sr. Medina le solicitó que le pidiera al abogado que lo fuera a visitar a su casa. A tenor con la solicitud del Sr. Medina, el periodista procedió a comunicarse con el licenciado Ortiz Brunet.**

**Sin embargo, el 11 de febrero de 1998, el Procurador General decidió tomar una declaración jurada a Maldonado. Un tanto contrario a lo afirmado en la declaración jurada a que hemos hecho referencia, del 17 de noviembre de 1997, en esta ocasión Maldonado señaló que el Sr. Medina le indicó que interesaba que el licenciado Ortiz Brunet lo llamara, contrario a lo que había declarado anteriormente. Además, recalcó que se comunicó con el abogado y le advirtió sobre el hecho de que aún no habían entregado el cuerpo del difunto a sus familiares y que había que "tener mucho cuidado".**

III

**Por otro lado, también se le imputa al licenciado Ortiz Brunet la violación al Canon 38 de Etica Profesional que, en lo pertinente, establece que:**

> **"El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar <u>hasta la apariencia de conducta profesional impropia</u>. [ ... ]"**
> **(Enfasis suplido.)**

"La apariencia de impropiedad puede ser muy lesiva al respeto de la ciudadanía por sus instituciones de justicia y por la confianza que los clientes depositan en sus abogados". <u>In re: Rojas Lugo</u>, 114 D.P.R. 687, 690 (1983). En <u>In re: Coll Pujols</u>, 102 D.P.R. 313 (1974), señalamos que "[c]ada abogado es un espejo en que se refleja la imagen de la profesión. Sus actuaciones reflejan ante la comunidad las bases del concepto que ésta se forme, no solamente del abogado en particular que actúa, sino también de la clase profesional toda que debe representar con limpieza, lealtad, y el más escrupuloso sentido de responsabilidad."

Coincidimos con el criterio del Procurador General cuando expresa que la inmediatez de la presencia de los abogados, con o sin el consentimiento del cliente potencial, en momentos de indudable angustia de los familiares de una víctima, siembra serias dudas sobre la conducta profesional de los miembros de la profesión. Este proceder es claramente lesivo al buen nombre de la profesión y al suyo propio como profesional. Véase: <u>Florida Bar</u> v. <u>Herick</u>, 571 So.2d, 1303 (Florida 1990).

IV

En conclusión, <u>y en relación con el cargo por la alegada violación al Canon 34 de Etica Profesional</u>, somos del criterio que, no obstante el Lcdo. Ortiz Brunet haber incurrido en conducta altamente sospechosa y marginal, <u>no</u> podemos definitivamente concluir que dicha conducta en efecto violentó las disposiciones del mencionado Canon 34. La evidencia con que contamos, no hay duda, es contradictoria, y aun cuando de dicha prueba ciertamente se pueden hacer varias inferencias perjudiciales al Lcdo. Ortiz

Brunet, entendemos que la misma <u>no</u> es suficiente para entender infringido el Canon 34.

Ahora bien, <u>y en lo referente a la violación al Canon 38 de los de Etica Profesional</u>, la situación es distinta. La conducta desplegada en el presente caso por el Lcdo. Ortiz Brunet, <u>cuando menos</u>, infringe el principio rector del mencionado Canon 38, cual es que el abogado tiene el deber ético de "...evitar hasta la <u>apariencia</u> de conducta profesional impropia". (Enfasis suplido.)

**En vista a ello, y como medida disciplinaria resulta procedente que este Tribunal dicte Sentencia censurando severamente al Lcdo. Jorge Ortiz Brunet por la conducta incurrida en el presente caso. El mencionado abogado deberá, en el futuro, ejercer mayor cautela y atenerse estrictamente a los postulados que regulan la profesión de abogado y se le apercibe contra futuras infracciones.**

Se dictará Sentencia de conformidad.


FRANCISCO REBOLLO LOPEZ
                                    Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


**In re:**

LCDO. JORGE ORTIZ BRUNET                    CP-1998-10




SENTENCIA

San Juan, Puerto Rico, a 22 de noviembre de 2000


**Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia <u>censurando severamente</u> al Lcdo. Jorge Ortiz Brunet por la conducta incurrida en el presente caso. El mencionado abogado deberá, en el futuro, ejercer mayor cautela y atenerse estrictamente a los postulados que regulan la profesión de abogado y se le apercibe contra futuras infracciones.**

**Así lo pronunció, manda el Tribunal y certifica la señora Secretaria del Tribunal Supremo. El Juez Presidente señor Andréu García y la Juez Asociada señor Naveira de Rodón inhibidos. El Juez Asociado señor Fuster Berlingeri no interviene.**


**Isabel Llompart Zeno**
**Secretaria del Tribunal Supremo**